UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUANITA GONZALEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | Case No.: 1:12-cv-00801 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, CAROLYN COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF JUANITA GONZALEZ |

    Juanita Gonzalez ("Plaintiff") asserts she is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff asserts the administrative law judge ("ALJ") erred in assessing the credibility of her subjective complaints, and seeks judicial review of the decision. For the reasons set forth below, the administrative decision is **AFFIRMED**.

**PROCEDURAL HISTORY**

    Plaintiff filed an application for supplemental security income on March 13, 2008, alleging disability since December 15, 2007. (Doc. 12-6 at 2). The Social Security Administration denied her claim initially and upon reconsideration. (Doc. 12-5 at 3-7). After requesting a hearing, Plaintiff testified before an administrative law judge ("ALJ") on June 7, 2010. (Doc. 12-3 at 27). The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on September 22, 2011. *Id.* at 10-22. Plaintiff requested review by the Appeals Council of

1

Social Security, which found no reason to review the ALJ's decision and the request for review on March 19, 2012. *Id.* at 2-5. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

Plaintiff initiated this action on May 16, 2012, seeking review of the Commissioner's decision. (Doc. 1). On December 18, 2012, Plaintiff her opening brief in the action. (Doc. 13). Defendant filed a brief in opposition on February 15, 2013. (Doc. 15). Plaintiff did not file a reply brief.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 416.927, 416.929.

**A.     Relevant Medical Evidence**

On October 3, 2003, Plaintiff attempted suicide via overdose. (Doc. 12-8 at 32, 95). Plaintiff was hospitalized for five days at Kern Medical Center after her husband found her unresponsive. *Id.* at 32. Plaintiff reported she had to be put in restraints during her hospitalization, and injured her shoulder while restrained. (Doc. 12-9 at 2).

Plaintiff had an x-ray of her right shoulder taken on March 19, 2004. (Doc. 12-8 at 7). Dr. Jeffrey Child found there was "[p]robable calcific tendinitis and/or bursitis." *Id.* In addition, Dr. Child opined Plaintiff had "[m]ild narrowing of the coracoacromial arch due to congenital lateral downsloping of the acromion." *Id.* According to Dr. Child, if impingement syndrome was clinically indicated, an MRI would be of further value. *Id.*

On September 19, 2006, Plaintiff was treated at the Kern Medical Center. (Doc. 12-8 at 95). She reported "experiencing depression, stress due to financial problems, fatigue, mood springs, and . . . feelings of confusion." *Id.* Plaintiff reported she felt lost and thought about dying. *Id.* In addition, Plaintiff stated she got dizzy, had headaches, and was "awake most of the night." *Id.* She reported she would like to have counseling for her symptoms. *Id.*

Upon referral from Dr. Matis at Kern Family Medical Group, Dr. Robert Kopelman treated Plaintiff at Central Nephrology Medical Group on November 12, 2007. (Doc. 12-8 at 99). Dr. Kopelman noted he had treated Plaintiff previously in September 2005, when Plaintiff showed "early diabetic glomerulosclerosis with proteinuria." *Id.* On January 8, 2008, Dr. Kopelman noted Plaintiff had been diagnosed with "Type 2 diabetes, hypertension, hyperlipidemia and obesity." (Doc. 12-9 at 18). He discussed "exercise, diet and renal protection issues" with Plaintiff, and "strongly encouraged [her] to monitor her blood pressure." *Id.*

Dr. Greg Hirokawa conducted a comprehensive psychiatric evaluation on August 3, 2008. (Doc. 12-9 at 2). Dr. Hirokawa noted: "The claimant reported feeling depressed, anxious, poor sleep, mood swings, withdrawn, poor concentration, easily frustrated, irritable, loss of interest in things, and some memory problems." *Id.* Plaintiff attributed her depression and anxiety to "physical problems, dealing with pain, having financial issues, not being able to work, and do the things she used to do." *Id.* According to Dr. Hirokawa, Plaintiff exhibited cooperative behavior, her thought content was appropriate, and her stream of mental activity and association of thought were within normal limits. *Id.* at 4. Based upon the examination and Plaintiff's psychiatric condition, Dr. Hirokawa opined:

> The claimant's ability to understand and remember detailed instructions is moderate.
>
> The claimant's ability to maintain attention and concentration is mild to moderate.
>
> The claimant's ability to accept instructions from a supervisor and respond appropriately is mild to moderate.
>
> The claimant's ability to sustain an ordinary routine without special supervision is mild to moderate. The claimant's ability to complete a normal workday and workweek without interruptions at a consistent pace is moderate.

*Id.* at 6. Dr. Hirokawa gave Plaintiff a GAF score of 52, explaining her "symptoms of depression appear[ed] to be within the moderate range and primarily due to her physical problems and the associated limitations."[1] *Id.* at 5.

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.* at 34.

Plaintiff had a comprehensive internal medicine evaluation by Dr. Sarupinder Bhangoo on August 30, 2008. (Doc. 12-9 at 7). Plaintiff reported she felt "arthritic pains in both shoulders and arms," which she rated "anywhere from 5/10 to 8/10." *Id.* Plaintiff explained she had "a hard time reaching, bending, lifting, and doing any work." *Id.* According to Dr. Bhangoo, Plaintiff's diabetes and hypertension were "under good control." *Id.* at 10. Based upon the examination and testing of Plaintiff's range of motion, Dr. Bhangoo determined Plaintiff had the ability to "stand and walk six hours in an eight-hour day, sit for eight hours in an eight-hour day, and "[t]he amount of weight the claimant could lift and carry occasionally is 50 pounds, frequently 25 pounds." *Id.* at 10. In addition, Dr. Bhangoo opined Plaintiff did not have limitations with bending, stooping, crouching, handling, feeling, grasping, or fingering. *Id.* However, Plaintiff "may have limitations of reaching with her right shoulder." *Id.* Dr. Bhangoo concluded Plaintiff's "maximum functional capacity is rated as medium with the limitation of reaching with the right shoulder." *Id.* at 11.

On September 8, 2008, Plaintiff was treated at Central Nephrology Medical Group. (Doc. 12-9 at 13). Dr. Samuel Feizi noted Plaintiff had no current complaints, although her blood work showed high levels of creatinine, "at least 0.7 to 0.8 above her baseline of 0.9 to 1.0." *Id.* Also, he observed Plaintiff's hypertension was "adequately controlled." *Id.* Dr. Feizi referred management of Plaintiff's diabetes to her primary care doctor. *Id.* at 14.

Dr. De La Rosa completed a physical residual functional capacity assessment and case analysis on September 16, 2008. (Doc. 12-9 at 23-30). Dr. De La Rosa opined Plaintiff was able to lift and carry 25 pounds frequently and 50 pounds occasionally, stand and/or walk about six hours in an eight-hour workday, and sit (with normal breaks) for a total of about six hours in an eight our workday. *Id.* at 24. In addition, Dr. De La Rosa opined Plaintiff was able to frequently balance, stoop, kneel, and crouch. *Id.* at 25. Although Plaintiff could frequently climb ramps and stairs, she was limited with reaching and could never climb ladders, ropes, or scaffolds. *Id.* Dr. De La Rosa noted Plaintiff was "observed weight bearing on both arms without problems," and her range of motion with her shoulder was normal. *Id.* at 29. Dr. De La Rosa concluded a limitation to medium work was appropriate. *Id.*

Dr. Nadine Kravata completed a psychiatric review technique and mental residual functional capacity assessment on September 27, 2008. (Doc. 12-9 at 29-43). Dr. Kravata noted Plaintiff was

5

"currently not in any mental health counseling or taking any [prescription] meds." *Id.* at 29.  Further, Plaintiff was "able to manage her day to day living skills," although she did not enjoy doing anything for fun.  *Id.*  Dr. Kravata opined Plaintiff had mild restriction with her activities of daily living and maintaining social functioning.  *Id.* at 38.  In addition, Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace.  *Id.*  According to Dr. Kravata, Plaintiff was "not significantly limited" in her ability to understand, remember, and carry out very short and simple instructions; to maintain attention and concentration for extended periods; and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  *Id.* at 41-42.  In addition, Dr. Kravata found Plaintiff was "not significantly limited" in all areas of social interaction and adaptation.  *Id.* at 42.  She believed Plaintiff "would be able to sustain attention and concentration for simple work related tasks for extended [periods] over the course of a normal workday and workweek."  *Id.* at 43.  Dr. Kravata concluded Plaintiff's "impairment would not preclude employment at a competitive level."  *Id.* at 29.

Dr. Luu reviewed the record and affirmed Dr. Kravata's assessment on January 7, 2009.  (Doc. 12-9 at 62-63).  Specifically, Dr. Luu opined Plaintiff was able to perform simple, repetitive tasks.  *Id.* at 63.  Likewise, Dr. Herbert Waxman reviewed the record and affirmed the physical residual functional capacity assessment of Dr. De La Rosa.  *Id.* at 64.

Plaintiff was treated at Central Nephrology throughout 2009.  On March 4, 2009, Plaintiff reported she "had episodes of chest pain."  (Doc. 12-9 at 78).  Dr. Feizi advised Plaintiff "to have both [her] blood pressure and pulse checked at home at least twice a day and fax the recorded blood pressure and pulse to [his office]."  *Id.* at 79.  In July 2009, Plaintiff reported she had no new complaints and was feeling well.  *Id.* at 75.  Dr. Kyaw noted Plaintiff had "[a]cute decline in renal function," which was attributed to Plaintiff's taking ibuprofen.  *Id.* at 75.  Plaintiff's blood pressure was well-controlled.  *Id.* at 76.  In October 2009, Dr. Kyaw observed Plaintiff "continued to do well."  *Id.* at 69.

On July 21, 2010, Dr. Fehma Rufail completed a questionnaire regarding Plaintiff's functional capacity.  (Doc. 12-10 at 84).  Dr. Rufail opined Plaintiff's medical problems—including leg neuropathy, blisters, carpal tunnel, and diabetes mellitus— precluded her from performing full time

work at any exertional level. *Id.* According to Dr. Rufail, Plaintiff was able to sit for one hour at one time and six hours in an eight-hour day. *Id.* In addition, Plaintiff was able to stand and/or walk for twenty minutes at a time, and four hours total in an eight-hour day. *Id.*

**B.    Hearing Testimony**

On June 7, 2010, Plaintiff; Dr. Sergio Bello, a medical exert; and Jasmine Gonzalez, Plaintiff's daughter, testified at an administrative hearing before the ALJ. (Doc. 12-3 at 28).

Dr. Bello reported he had reviewed the medical record in the case, but had questions about the problems, if any, Plaintiff had with her shoulders. (Doc. 12-3 at 30). The ALJ permitted Dr. Bello to question Plaintiff directly about her shoulders, and Plaintiff reported she had "a lot of problems" with her right shoulder, and was unable to lift her right arm "very far" or reach back. *Id.* at 30-31. Plaintiff said she injured her shoulder in October 2003, and since then had been given pain medication by her primary care physicians, but "[t]hey haven't really done anything." *Id.* at 32. Dr. Bello asked Plaintiff what was bothering her the most and prevented her from engaging in activities on a regular basis, and Plaintiff responded her depression was "a big thing" and her diabetes was "out of control." *Id.* at 33.

Based upon his review of the medical record and Plaintiff's responses to his questions, Dr. Bello opined Plaintiff had medically determinable physical impairments. (Doc. 12-3 at 35). He observed that "really in the last two years there is nothing in the record about what's going on with the shoulder," and there was "very little in terms of complaints in the record and function of the shoulder." *Id.* at 35. Dr. Bello described Plaintiff's shoulder condition as "undeveloped," explaining: "I don't think we have enough evidence to really assess what the function or the dysfunction is of that limb." *Id.* at 35-36. Given the evidence in the medical record, Dr. Bello stated she had "a full life RFC." *Id.* at 39. He believed Plaintiff was "probably worse than this," but he said he lacked the evidence to support a reduction of her RFC. *Id.*

Plaintiff testified after the medical expert at the hearing, and stated she told her doctor "a couple of weeks" prior to the hearing that her "shoulder has been bothering [her] a lot more." (Doc. 12-3 at 42). She explained her should her "all the way in to [her] neck" and caused headaches. *Id.* In addition, Plaintiff said she had complained about her hands and dropping things to her doctors "a few years back." *Id.*

Plaintiff testified her hands would swell, and that she had pain in her fingers "all day long." (Doc. 12-3 at 44-45). She reported also that she had "numbness" in her hands. *Id.* at 45. Plaintiff said the pain was in her bones, and went down past her elbow. *Id.* According to Plaintiff, she tried to exercise her hands or keep them warm until the swelling was reduced. *Id.* She stated her pain was greater in the winter and it would cause her to wake up in the middle of the night "[b]ecause of the pain in [her] fingers, the numbness in [her] hand." *Id.* In addition, Plaintiff reported she had "sharp pains every once in a while" in her feet, toes, and fingers. *Id.* at 46. She stated her doctor attributed her pain to diabetes. *Id.*

Further, Plaintiff testified she was very depressed and slept "sometimes all day," (Doc. 12-3 at 48-49). Plaintiff estimated she was able to function "maybe one or two days at the most" during the week, and did not leave her room for "three or four days out of the week." *Id.* at 49, 51. She stated that she had "a lot of crying spells," and she was taking antidepressant medication since about 1995. *Id.* at 50, 58. In addition, Plaintiff said began mental health therapy the week of the hearing. *Id.* at 58. Plaintiff reported her ability to focus or concentrate was diminished, but Plaintiff believed she could concentrate for about an hour. *Id.* at 50.

According to Plaintiff, she could comfortably lift and carry five pounds. (Doc. 12-3 at 46). She estimated she was able to stand "maybe twenty to thirty minutes at the most." *Id.* at 47. Also, Plaintiff said she could not sit for long periods of time because it would cause her feet to swell and her legs to feel "like jelly." *Id.* She reported that she elevated her feet an average of a couple hours each day, but sometimes four or five hours. *Id.* at 48. Plaintiff reported her daughter took care of most of the household chores, but Plaintiff was able to do a load of laundry and dishes when she felt well and her feet did not hurt. *Id.* at 49.

Similarly, Jasmine Gonzalez, Plaintiff's nineteen-year-old daughter, testified her mother was "always saying she's not really able to do a lot around the house." (Doc. 12-3 at 53). Ms. Gonzalez reported Plaintiff was sick "four or five" days out of the week, and stayed in bed most of the time. *Id.* at 54-55. Ms. Gonzalez stated Plaintiff was not able to completely straighten her fingers, and her feet and ankles would swell. *Id.* at 53, 56. In addition, Ms. Gonzalez confirmed that Plaintiff complained about shoulder pain and cried a lot. *Id.* at 55.

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after her application date of March 3, 2008. (Doc. 12-3 at 15). Second, the ALJ found Plaintiff's severe impairments included: "diabetes mellitus with glomerular nephropathy, obesity, carpal tunnel syndrome, right shoulder impingement and a depressive disorder." *Id.* Next, the ALJ found Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listing. *Id.* at 15-16.

The ALJ determined Plaintiff had the residual functional capacity ("RFC") "to perform light work as defined in 20 CFR 416.967(b) except the claimant can only occasionally reach overhead with the right upper extremity." (Doc. 12-3 at 16). In addition, the ALJ determined Plaintiff could "perform simple, repetitive tasks that do not involve working with the public." *Id.* With this RFC, the ALJ found Plaintiff was "unable to perform any past relevant work," but there were "jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." *Id.* at 21. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 22.

## DISCUSSION AND ANALYSIS

In determining credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints. *Id.* at 1036.

Plaintiff asserts that "the ALJ did not properly conduct the mandated second step of the two-step analysis." (Doc. 13 at 6). According to Plaintiff, "The ALJ does not offer a single legally sufficient reason to reject the testimony of Juanita Gonzalez." *Id.* Plaintiff argues that "the ALJ ignored and disregards [her] testimony," and instead "simply set[] forth the oft rejected boilerplate language numerous courts have rejected." *Id.* at 7-8 (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). On the other hand, Defendant argues the ALJ properly considered a number of factors, including her inconsistent statements, the medical record, and failure to seek treatment. (Doc. 15 at 6).

9

An adverse credibility determination must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). In this case, the ALJ found Plaintiff's "medically determinable impairments could be expected to cause the alleged symptoms." (Doc. 12-3 at 17). However, the ALJ determined Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible..." (Doc. 12-3 at 17). In support of this finding, the ALJ cited the medical record, noted inconsistent statements made by Plaintiff, and considered her failure to seek treatment. *Id.* at 17-18.

*Objective medical evidence*

Generally, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); SSR 96-7p, 1996 SSR LEXIS 4, at *2-3 (the ALJ "must consider the entire case record, including the objective medical evidence" in determining credibility, but statements "may not be disregarded solely because they are not substantiated by objective medical evidence").

Here, the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff. Thus, the objective medical evidence was a relevant factor in determining Plaintiff's credibility. However, in citing to the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather,

the ALJ "must state which pain testimony is not credible and what evidence suggests the claimants are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

The ALJ noted Plaintiff "complained of back pain" but did not mention back pain at the consultative examination and "[r]adiological studies of the thoracic spine showed only moderate thoracolumbar and mild lumbar spondylosis." (Doc. 12-3 at 17). Although Plaintiff complained of difficulty with her hands and grasping items, the ALJ noted Dr. Bhangoo "found no limitations of handling, feeling, grasping or fingering." *Id.* at 18. In addition, the ALJ observed "there is no electromyography or nerve conduction study" that verified Plaintiff's carpal tunnel syndrome or alleged functional limitations attributable to the syndrome. *Id.*

Therefore, the ALJ carried her burden to identify "what evidence undermines the testimony," and the objective medical evidence supports the ALJ's credibility determination. *See Holohan v* 246 F.3d at 1208.

*Inconsistencies*

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). In addition, the ALJ may consider inconsistencies between testimony and conduct. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Here, the ALJ noted: "Even though the claimant alleged that she is sick all the time, on September 8, 2008, she had no complaints [citation] and on February 11, 2010, she was described as doing well." (Doc. 12-3 at 17). Further, the ALJ noted Plaintiff complained of pain in her feet and difficulty walking, but Dr. Bhangoo determined Plaintiff's "[g]ait was normal, straight leg raising negative, and there were no neurological deficits." *Id.* The inconsistencies in Plaintiff's testimony and conduct was a valid consideration by the ALJ and supports the adverse credibility determination. *Smolen*, 80 F.3d at 1284; *Fair*, 885 F.2d at 603.

*Treatment received*

In assessing Plaintiff's credibility about his symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility

finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged); *see also Burch*, 400 F.3d at 681 (finding the ALJ's consideration of the claimant's failure to see treatment for a three or four month period was "powerful evidence" and an "ALJ is permitted to consider lack of treatment in his credibility determination). In this case, the ALJ observed "there is no evidence of a longitudinal history of a psychiatric impairment, or prolonged outpatient treatment or of repeated hospitalizations." (Doc.12-3 at 17). Thus, Plaintiff's lack of treatment supports the credibility determination.

## CONCLUSION AND ORDER

The ALJ satisfied her burden to make "a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). Because the ALJ applied the proper legal standards and her findings are supported by the record, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The administrative decision is **AFFIRMED**; and
2. The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Juanita Gonzalez.

IT IS SO ORDERED.

Dated:   **April 13, 2013**             **/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE